No. 99,705

In the Matter of KEVIN C. HARRIS, *Respondent*.

(186 P.3d 737)

Opinion filed June 27, 2008.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the brief for petitioner.

*Steven R. McConnell*, of McConnell & McMahon, Overland Park, argued the cause and was on the brief for respondent, and *Kevin C. Harris*, respondent, argued the cause pro se.

*Per Curiam*: This is an original uncontested proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Kevin C. Harris, of Shawnee Mission, an attorney admitted to the practice of law in Kansas in 1985.

A hearing was held before a panel of the Kansas Board for Discipline of Attorneys. The respondent appeared in person and with his attorney. The hearing panel concluded that the respondent violated Kansas Rules of Professional Conduct (KRPC) 3.1 (2007 Kan. Ct. R. Annot. 500) (meritorious claims and contentions); KRPC 3.2 (2007 Kan. Ct. R. Annot. 503) (expediting litigation); and KRPC 3.4(d) (2007 Kan. Ct. R. Annot. 514) (fairness to opposing party and counsel). The hearing panel unanimously recommended that the respondent be suspended from the practice of law for a period of 2 years. The respondent filed exceptions to the final hearing report pursuant to Supreme Court Rule 212 (2007 Kan. Ct. R. Annot. 317).

The panel's final hearing report provides, in part, as follows:

### "FINDINGS OF FACT

. . . .

"2. Raymond Harris had five children: three sons, the Respondent, Dennis Harris, and Brian Harris, and two daughters, Patricia Blenis and Mary Sobray.

"3. During the lifetime of Raymond Harris, disputes arose between the siblings as to where Raymond Harris should live and how he should be cared for. At some point, competing guardianship and conservatorship cases were filed at approximately the same time, one in Johnson County, Kansas, and one back East.

The Court back East concluded that Kansas was the proper venue and dismissed the pending litigation.

"4.    In the Kansas guardianship case, the Respondent was appointed to serve as the guardian and [brother] Dennis Harris was appointed to serve as the conservator.

"5.    Raymond Harris died on August 31, 2003.

"6.    On September 29, 2003, Ms. Blenis wrote to Judge Sheppard of the Johnson County District Court [successor judge in the guardianship/conservator action]. In her letter, she stated:

'Please know that in the matter of guardianship and conservatorship of Raymond J. Harris, Case Number: 02GC28 there has been absolutely no accounting filed as ordered by Judge Bruner [original judge] and as stipulated in the Kansas statutes. I am concerned about this because Raymond J. Harris was my father. Sadly, he passed away on August 31, 2003.

'Judge Bruner's ruling on June 14, 2002 states, "The Court is going to appoint him (Dennis Harris) conservator and require a full inventory within thirty days that is in accordance with K.S.A. 59-1021, and will require for his service the appointment and qualification of resident agent and a surety bond in the amount of $350,000." I have called the clerk's office several times only to be told this inventory has never been filed. I am also aware that an annual accounting was due in July 2003. Again, I have made several calls to the clerk's office only to be told that it has not been filed. I was told a second reminder was mailed to the conservator on August 26, 2003 asking for the conservator's annual report. As of today, this has not been filed.

'You may recall that I was in your courtroom on January 23, 2003 with a motion to clarify the order for guardianship. I simply visited my father after he was admitted to Shawnee Gardens Nursing Center and because the guardian, Kevin Harris, instructed the nursing home not to let me visit my dad, I was escorted out of the center. I must tell you, the ruling of June 14, 2002 when Kevin Harris was named guardian and Dennis Harris was named conservator greatly disappointed me. My sister and I asked for a third party in both capacities. Even though this decision disappointed me and I believe devastated my father, I had to comply with the ruling. The accounting should be filed as ordered by Judge Bruner and as stipulated by the laws of Kansas. My feeling is that the Court named Dennis Harris as the conservator so now the Court should hold him accountable to the responsibilities he asked for and willingly accepted.

'I would also like you to know that I recall while I was in your courtroom on January 23, 2003, I heard you tell the guardian, Kevin Harris, to make his sisters aware of their father's condition. You should know that my sister and I were not notified when our father received ten or more stitches in his head due to a fall, when he was moved to the Alzheimer's unit at Shawnee Gardens, and when hospice care was required. My sister received a letter from the guardian informing her of the death of Ray Harris. Sadly, the letter arrived

the same day a Mass in his honor was held. My father deserved to have all five of his children there as well as my son, his grandson. I simply do not understand how all of this could have happened. Judge Bruner said on June 14, 2002, "Kevin Harris has now become an independent legal guardian, but with responsibilities to his sisters to assure that the loving relationship between his father and his sisters and Mr. Raymond Harris's daughters will be protected by the Court as you are well aware." He went on to say, "You should provide for their ability to see Ray. It is your obligation." Nothing will bring back my dad or the time I would have like to have spent with him, to ease his pain or comfort him. So, for me, the worst has happened, my dad died a lonely, agonizing death without his children with him.

'I believe both the conservator and the guardian disregarded Judge Bruner's ruling, K.S.A. 59-1021 and 59-3018 and your instructions on January 23, 2003. I am asking for your help in rectifying the situation in any way possible. I appreciate your time and consideration.

'As a personal favor, I would appreciate it if my address could be redacted should this letter need to be part of the public file.'

"7.   On October 4, 2004, the Respondent filed suit against Ms. Blenis and her attorney, Jean Ann Uvodich. The Respondent alleged that Ms. Blenis defamed the Respondent. The Respondent also alleged that Ms. Blenis and Ms. Uvodich engaged in malicious prosecution. Later, the Respondent filed an Amended Petition and alleged that Ms. Uvodich also defamed the Respondent.

"8.   Ms. Uvodich contacted her professional negligence carrier and reported the suit filed by the Respondent. Thereafter, Robert J. Luder and Kim J. Poirier entered their appearance in behalf of Ms. Uvodich.

"9.   Ms. Uvodich answered the Petition and the Amended Petition and denied the allegations. Additionally, Ms. Uvodich asserted that the Respondent's allegations are frivolous, represent an abuse of process, and should be dismissed. The Respondent attempted to achieve service on Ms. Blenis by serving Ms. Uvodich. However, Ms. Uvodich's scope of representation did not extend to all representation of Ms. Blenis.

"10.   On December 20, 2004, counsel for Ms. Uvodich served the Respondent with her opening interrogatories and her first request for production of documents. The Respondent failed to timely answer the discovery requests.

"11.   On December 22, 2004, counsel for Ms. Uvodich served the Respondent with a request for a statement of monetary damages. On January 18, 2005, the Respondent provided a statement of monetary damages, requesting $112,357.67 in damages. The respondent's written statement failed to describe how the damages were calculated. At the hearing on this matter, the Respondent testified as follows regarding that figure:

'Q.   [By a member of the panel] And the first—the first sentence talks about your monetary damages being $112,357.67?

'A.   [By the Respondent] Yes.

'Q. Did you ever itemize that? I know on Page 36 a request was made for that. Did you ever—did you ever provide an itemization of that?

'A. I responded with that amount. And I think that's the only response I gave. They never brought up the amount of monetary damages. I did have that itemized in the probate case. And for—for whatever reason, Mr. Martin was denied my—any—I didn't get any attorney's fees from all the work I did in the probate case. I didn't get the filing fee back. I didn't get the filing fee back I had on the case, on the rent-in-possession case. And I didn't get paid for that because Ms. Uvodich and her clients didn't want to pay for it.

'I had to pay to bury my—my parents, because the two daughters would not agree to pay the funeral expenses for my mother and father. My brother Brian, my brother Dennis, and I had to pay for the funeral.

'Q. Is that what you just listed, that's the basis for the $112,000?

'A. The $112,000 was based on my time as an attorney, going through there, and also my time as a guardian where I spent—I took care of my father. I saw him four to five times a week when he was in the nursing home. I called daily when he lived at 4914 Neosho which I think Mr. Merker said six to ten blocks, it's actually about two blocks away. I live at 5201 Howe.

'And I would see him every day. I would feed him. Money came out of my pocket to go ahead and buy him food and that sort of thing. I had the—all that worked up, I got turned down, and I threw it away.

. . . .

'Q. [By a member of the panel] Just to clarify what you were just talking about. Are you saying that in your damages that you were requesting in this lawsuit of the $112,000, that includes your time for taking care of your dad at your attorney rate?

'A. No. No. No. No. No. That was at a—I forget the hourly rate that the—the courts use in Johnson County, but I think it was like $15, $20 an hour.

'Q. Okay. So you were saying that that is—you were requesting compensation for the time at a guardian rate?

'A. I was—well, there were two different rates. Attorney—attorney rate of $150 an hour and then the guardian rate at $15 or $20, and I really forget which.

'Q. Okay. But what I'm—what I'm trying to figure out is included in the damages you're asking then, as I understand your testimony, you're saying that you calculated the time involved and requested compensation for that? Time involved in caring for your father.

'A. That's correct.

'Q. Okay. Thank you.

'A. And I was denied that compensation, I believe through the efforts of Ms. Uvodich's clients. I never got a dime. I never got anything.

. . . .

'Q. [By a member of the panel] And if I understand your testimony, Mr. Harris, that's part of the damages that you believe that—or that—for which you sued Ms. Uvodich. Right?

'A. Yes.'

"12. On December 23, 2004, the Respondent delivered a notice of deposition to a mail box rented in behalf of Ms. Blenis. The notice of deposition required that Ms. Blenis appear for a deposition on January 6, 2005. Ms. Blenis did not appear at the deposition on January 6, 2005. Later, the Respondent sought sanctions against Ms. Blenis for failing to appear for her deposition. The Court overruled the Respondent's motion.

"13. Counsel for Ms. Uvodich sent the Respondent two letters requesting that he comply with the discovery requests. The Respondent failed to respond to the two letters and failed to provide responses to the requests for discovery.

"14. Counsel for Ms. Uvodich was forced to file a motion to compel discovery. At approximately the same time, counsel for Ms. Blenis filed a motion for judgment on the pleadings.

"15. At the time the motion to compel was scheduled to be heard, on March 9, 2005, the Respondent filed a motion for a protective order. The Court took up both motions that day. The Court granted the motion to compel and denied the Respondent's motion for a protective order. The Court ordered the Respondent to respond to the requests for discovery by March 31, 2005.

"16. On March 31, 2005, the Respondent filed a motion for an extension of time to answer the requests for discovery. It is unclear from the record whether the Respondent's motion was heard or ruled on by the Court. However, the Respondent never provided responses to the requests for discovery.

"17. Counsel for Ms. Uvodich filed a motion to dismiss [and] requested sanctions. The Court took up a number of motions on April 20, 2005. At the hearing, the Court denied the Respondent's motion for default judgment and granted, in part, Ms. Uvodich's request for sanctions. The Court scheduled an additional hearing for April 21, 2005, at 1:30 p.m.

"18. On the morning of April 21, 2005, the Respondent called the Court and informed the Court that he planned to dismiss the action. The Court advised the Respondent to contact opposing counsel and inform them to avoid having them show up for the scheduled hearing. The Respondent left messages for the attorneys representing Ms. Blenis and Ms. Uvodich, but they did not receive the messages. When counsel for Ms. Blenis and counsel for Ms. Uvodich appeared in Court for the hearing, the Court informed Ms. Blenis and Ms. Uvodich that the Respondent indicated that he was going to dismiss the case. Ms. Blenis and Ms. Uvodich objected to proceeding with an oral motion to dismiss. The Court ordered the Respondent to file a written motion to dismiss within ten days. The Respondent failed to file a written motion to dismiss within ten days.

"19. The Court held a scheduling conference. The Respondent failed to appear at the scheduling conference. At that time, because the Respondent had failed to comply with the Court's order, the Court dismissed the case. The Court scheduled a subsequent hearing to take up the matter of sanctions.

"20. Thereafter, counsel for Ms. Blenis and counsel for Ms. Uvodich filed separate additional motions for sanctions.

"21. The Court later concluded that the Respondent's action was frivolous in nature, pursuant to K.S.A. 60-211 and awarded sanctions against the Respondent in the amount of $2,904.00 for Ms. Blenis and in the amount of $6,312.17 for Ms. Uvodich. The sanctions were paid by the Respondent through a garnishment proceeding on monies held in behalf of the Respondent by the administrator of Raymond Harris' estate, Barry Martin."

## EXCEPTIONS AS TO FINDINGS OF FACT

The respondent filed exceptions to the panel's findings of fact contained in paragraphs 2, 3, 6, 8, 9, 10, 11, 12, 13, 14, 16, 18, 19, 20, and 21. The arguments asserted in the brief take issue with the panel's conclusions of law, its rationale concerning the appropriate discipline to be imposed ,and its recommended discipline. Accordingly, the respondent's exceptions to the findings of fact are deemed abandoned. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008) (exceptions filed but not argued in the respondent's brief deemed abandoned). We turn now to the panel's conclusions of law.

## CONCLUSIONS OF LAW

The panel concluded as follows:

"1. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 3.1, KRPC 3.2, and KRPC 3.4, as detailed below.

"2. 'A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous.' KRPC 3.1. The District Court concluded that the Respondent's claims were frivolous and awarded sanctions to the defendants. As such, the Hearing Panel concludes that the Respondent violated KRPC 3.1.

"3. An attorney violates KRPC 3.2 if he fails to make reasonable efforts to expedite litigation consistent with the interests of his client. In this case, the Respondent failed to expedite [the case] he filed against his sister and her attorney. The Respondent failed to comply with discovery requests, the Respondent failed to timely appear in Court for scheduling conference, and the Respondent failed to meet a deadline set by the Court. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 3.2.

"4. Lawyers are required to be fair to the opposing party and counsel. See KRPC 3.4(d). Specifically,

'[a] lawyer shall not . . . in pretrial procedure, . . . fail to make [a] reasonably diligent effort to comply with a legally proper discovery request by an opposing party.'

In this case, the Respondent failed to provide responses to discovery as requested by counsel for Ms. Uvodich and as subsequently ordered by the District Court. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 3.4(d)."

## DISCUSSION AS TO CONCLUSIONS OF LAW

Respondent's counsel requested and received two extensions of time to file exceptions, alleging he, personally, had medical issues. On the day before the exceptions were due, on the second and final extension, the respondent's counsel filed a notice stating that the respondent, himself, would be filing the exceptions. The respondent timely filed the exceptions; however, the only portion of the final hearing report that he filed exceptions to concerned the panel's findings of fact. He did not take exception to any of the panel's conclusions of law, stating, "As to the conclusions of law and recommendations, respondent requests the right to have counsel respond upon his recovery."

Supreme Court Rule 212(c) specifically states that "[a]ny part of the hearing report not specifically excepted to shall be deemed admitted." (2007 Kan. Ct. R. Annot. 317). Although the rule does not specifically address whether exceptions can be reserved to be asserted at a later date, the point is moot here, because the respondent's attorney never filed any supplement to the exceptions filed by his client.

Pursuant to Supreme Court Rule 212(c), failure to file exceptions constitutes admission. Thus, the violations found by the panel are deemed to be admitted.

We conclude the panel's findings of fact are supported by clear and convincing evidence and support the panel's conclusions of law. Further, we adopt the panel's findings of fact and conclusions of law.

We turn now to the panel's recommended discipline and its rationale relative thereto.

## RECOMMENDED DISCIPLINE

The panel stated:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing

Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the legal system to refrain from abusing process.

"*Mental State.* The Respondent knowingly and intentionally violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual harm to Ms. Blenis and Ms. Uvodich.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Prior Disciplinary Offenses. The Respondent has been previously disciplined on three occasions. Following a hearing before a Hearing Panel of the Kansas Board for Discipline of Attorneys, on April 26, 1994, the Respondent was informally admonished by the Disciplinary Administrator for failing to diligently represent his client, for failing to appear in court in behalf of his client, and for failing to forward the fine and costs to the Court in behalf of his client.

"On March 14, 1997, the Kansas Supreme Court placed the Respondent on supervised probation for two years for having engaged in misconduct. Specifically, the Respondent violated MRPC 1.15, MRPC 1.4, MRPC 1.16(a)(3), MRPC 1.16(d), and MRPC 1.5(a). *In re Harris*, 261 Kan. 1063 (1997).

"On January 28, 2002, the Disciplinary Administrator informally admonished the Respondent for failing to provide diligent representation in an appellate case.

"Dishonest or Selfish Motive. The Respondent's motivation to file suit against his sister and her attorney was motivated exclusively by the Respondent's selfishness.

"A Pattern of Misconduct. The Respondent repeatedly failed to respond to discovery requests. Accordingly, the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. The Respondent violated KRPC 3.1, KRPC 3.2, and KRPC 3.4(d). As such, the Respondent committed multiple offenses.

"Refusal to Acknowledge Wrongful Nature of Conduct. The Respondent refused to acknowledge the wrongful nature of his conduct.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1985. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for a period of approximately 20 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommen-

dation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"<u>Imposition of Other Penalties or Sanctions</u>. The Respondent was ordered to pay more than $9,000.00 in sanctions. The order for sanctions was satisfied by garnishing monies held in behalf of the Respondent by the administrator of Raymond Harris' estate, Barry Martin.

"<u>Remoteness of Prior Offenses</u>. The discipline imposed in 1994 and 1997 is remote in time and in character to the misconduct in this case. The discipline imposed in 2002 is remote in character to the misconduct in this case.

In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.' Standard 6.22.

'Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.' Standard 7.2.

. . . .

"The Deputy Disciplinary Administrator recommended that the Respondent be indefinitely suspended from the practice of law in the State of Kansas. Counsel for the Respondent recommended that the Respondent be informally admonished by the Disciplinary Administrator or that the Respondent be censured by the Kansas Supreme Court and that the censure be published in the Kansas Reports.

"The Hearing Panel has carefully considered the Respondent's misconduct in this case. The Hearing Panel is troubled by the Respondent's misconduct in this case. The Respondent's suit against his sister and her attorney was founded in defamation and abuse of process [malicious prosecution]. However, the damages alleged by the Respondent had nothing to do with the allegations of the petition. The Respondent sought more than $112,000 from his sister and his sister's attorney for unreimbursed expenses attendant to his father's needs and for the Respondent's time spent visiting his father. The Hearing Panel finds that the Respondent engaged in excessively aggressive conduct that assails the standards to which lawyers are to conduct themselves, in that Respondent would attempt to have his sister and her attorney pay the Respondent for time he spent visiting his father and other alleged damages that were not even remotely related to the allegations in the Petition or the Amended Petition.

"Based upon the findings of fact, conclusions of law, the aggravating and mitigation factors, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended for a period of two years from the practice of law in the State of Kansas.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## ANALYSIS

In order to determine the appropriate discipline to be imposed hereto, some additional discussion of the evidence presented at the hearing before the panel is necessary.

One of the witnesses, Richard Merker, testified that he had represented respondent when the guardianship was being contested. He described the relationship of respondent and his brother, Dennis, to their sisters, Patricia Blenis and Mary Sobray, was that of long-standing mutual hatred, with their father, Raymond, being caught in the middle. Respondent's anger toward his two sisters and their attorney, Jean Uvodich, was a large part of respondent's testimony. He was angry about the Judge Sheppard letter, requests made to SRS to investigate the father's care by respondent at the father's home and, later, in the nursing home, and rumors he believed had been started by the sisters and their attorney that he had stolen items from the father. Respondent testified:

"Q. When you filed this—the lawsuit against the—the defamation action, if you will, against Ms. Uvodich and Ms. Blenis, what was your reasoning for doing that?

"A. The reason for doing that was based upon this letter. Also the fact that throughout the neighborhood I was hearing matters that I had taken money from the—the estate. I had been hearing that I was not taking care of my father properly, that I was not carrying out my duties as a guardian.

"Q. Was it your understanding that these statements were coming from Ms. Sobray, Ms. Blenis, Ms. Uvodich?

"A. All of them.

"Q. All of them?

"A. I was tired of being called a thief. I never stole anything from my father. I never stole anything from my father's estate. And I get—kept being called a thief by these people. And I was tired of it. And I wanted to bring it to an end."

Respondent further testified:

"Q. So you were very angry by the time you filed this lawsuit, weren't you?

"A. I live in that neighborhood. I don't want people around there saying that I stole from my father.

"Q. My question was you were very angry. Correct?

"A. I was very angry because I was accused of stealing from my father. I was accused of mistreating my father. And those accusations were absolutely not true.

"Q. And you're still angry today?

"A. I am."

Respondent's position at the panel hearing was that he did primarily criminal defense work in his practice and, in essence, was unfamiliar with what must be pled in defamation actions and how to comply with civil discovery procedures. He reasons that his noncompliance is, therefore, excusable. Further, his sisters and their attorney had pushed him beyond endurance with the above-referenced false accusations and he was just reacting to that.

In his brief, respondent acknowledged it was a mistake for him to represent himself in the defamation/malicious prosecution action and "he should have retained an attorney to look at the case in an objective manner, free of the emotional aspect involved in this type of litigation." Before the panel and in his brief, respondent argues that in his own mind he was justified in filing the action.

Respondent specifically takes issue with the panel's statement that Blenis and Uvodich were harmed by the frivolous lawsuit. He portrays himself as the victim as the sanctions award was paid to them (from a garnishment against his inheritance). He views them as the winner and himself as the loser.

Respondent also challenges the panel's statement that he had refused to acknowledge the wrongful nature of his conduct.

As to the harm to Blenis and Uvodich and his refusal to acknowledge his conduct was wrong, respondent states in his brief:

"The uncontroverted evidence presented at the Hearing and through the exhibits received into evidence does not establish that any harm was inflicted upon Ms. Blenis or Ms. Uvodich. It appears that just the opposite has been established. While it is true that the Defendants had to hire attorneys to represent them in the litigation, their attorneys were paid for their representation by Respondent.

"Apparently, with the exception of Defendant Uvodich testifying at Respondent's Hearing, neither of them even had to appear in the District Court case. While not trying to excuse his conduct, or lay blame on anyone else but himself, Respondent has suffered because of his litigation beyond just the monetary issues, he is facing the loss of his license to practice law, the damage to his reputation in the community, and legal profession, and he is profoundly sorry for his actions.

"A review of the Transcript of Hearing does not reflect the sentiments of the Respondent as previously stated, but then again, he was not asked about his opinion or feelings on the matter, he was just trying to defend himself against the charges the best way he knew."

In his testimony before the panel there is nothing in his testimony that can be construed as remorse for his actions. His remorse

now seems to be centered on the harm and potential harm his actions have caused to himself.

Respondent also challenges the propriety of the panel's statement that his motivation in filing the action was selfishness. Respondent's motivation could more accurately be described as a desire to get even, to pay back for perceived wrongs, or just his own vindictiveness. However described, his motivation is certainly an aggravating factor. His failure to understand the requirements of defamation/malicious prosecution causes of action, civil discovery, and elements of damage available in such actions is no excuse for his conduct herein.

We find no merit in any of respondent's challenges to the rationale expressed by the panel in making its recommendation for discipline.

We accept the panel's recommendation that a 2-year suspension from the practice of law is the appropriate discipline to be imposed herein and its rationale supporting the recommendation. A minority would impose a lesser discipline.

IT IS THEREFORE ORDERED that Kevin C. Harris be suspended from the practice of law in the state of Kansas for a period of 2 years, effective the date of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2007 Kan. Ct. R. Annot. 261).

IT IS FURTHER ORDERED that respondent forthwith comply with Supreme Court Rule 218 (2007 Kan. Ct. R. Annot. 337), that the costs of these proceedings be assessed to the respondent, and that this opinion be published in the official Kansas Reports.